CALIFORNIA DEMOCRATIC PARTY; Bill Press; Susan Kennedy; San Francisco County Democratic Central Committee; Carole Migden; Sacramento County Democratic Central Committee; Rita Hodgkins; and Douglas Denton, Plaintiffs,

v.

Daniel LUNGREN, Attorney General of the State of California; California Republican Party; and Tirso Del Junco, Defendants.

No. C 94–1703 WHO.

United States District Court, N.D. California.

Aug. 5, 1994.

(at top right of page)

Joseph Remcho, Janet E. Sommer, John A. Lewis, Remcho Johansen & Purcell, San Francisco, CA, for California Democratic Party, Bill Press, Susan Kennedy, SF County Democratic Central Committee, Carole Migden, Sacramento County Democratic Central Committee, Rita Hodgkins, Douglas Denton.

Lance Olson, Olson, Hagel, Fong, Leidigh, Waters & Fishburn, Sacramento, CA, for Sacramento County Democratic Central Committee and Rita Hodgkins.

Linda Cabatic, Geoffrey Graybill, Sacramento, CA, for Daniel Lungren, Atty. Gen., of the State of Cal.

James R. Parrinello, John E. Mueller, Nielsen Merksamer Hodgson Parrinello & Mueller, Mill Valley, CA, for defendant California Republican Party.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiffs, California Democratic Party, Bill Press, Susan Kennedy, San Francisco County Democratic Central Committee, Carole Migden, Sacramento County Democratic Central Committee, Rita Hodgkins and Douglas Denton, have moved this Court to preliminarily enjoin defendant Daniel Lungren, the Attorney General of the State of California, from enforcing Article II, section 6(b) of the California Constitution. A hearing on the matter was held July 27, 1994. For the reasons set forth in this Opinion and Order, which constitutes the Court's findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure, the Court **GRANTS** plaintiffs' motion for a preliminary injunction.

### I.

Plaintiffs have filed an action seeking to have Article II, section 6(b) of the California Constitution declared unconstitutional on the ground that it violates the First and Fourteenth Amendments.[1] In addition, plaintiffs seek an order preliminarily enjoining the Attorney General from enforcing section 6(b) against them, arguing that such an enforcement action, if successful, would prevent plaintiffs from endorsing Delaine Eastin for State Superintendent of Public Instruction and other candidates for nonpartisan offices in the upcoming fall elections.

Article II, section 6(a)(b) of the California Constitution provides as follows:

(a) All judicial, school, county, and city offices shall be nonpartisan.

(b) No political party or party central committee may endorse, support, or oppose a candidate for nonpartisan office.

Section 6(b) has previously been challenged in federal court.[2] On August 31, 1990, the Ninth Circuit, sitting *en banc*, declared section 6(b)'s ban on nonpartisan endorsements unconstitutional and upheld a district court ruling from the Northern District of California enjoining its enforcement. *Geary v. Renne*, 911 F.2d 280 (9th Cir.1990) (*en banc*), vacated on other grounds, *Renne*

---

1. The First Amendment is made applicable to the states through the Fourteenth Amendment. *See, e.g., N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 907, 102 S.Ct. 3409, 3422, 73 L.Ed.2d 1215 (1982).

2. Section 6(b) was enacted in 1986 through a voter initiative. The initiative came in response to a ruling by the Supreme Court of California in which the Court interpreted a prior version of section 6 as one that did not prohibit parties from endorsing candidates for nonpartisan offices. *See Unger v. Superior Court*, 37 Cal.3d 612, 209 Cal.Rptr. 474, 692 P.2d 238 (1984).

*v. Geary,* 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). The Supreme Court vacated the Ninth Circuit's decision on jurisdictional grounds, concluding, in part, that the case was not ripe for review because the individuals challenging the law had not alleged "an intention to endorse any particular candidate." *Id.* at 321, 111 S.Ct. at 2339.

After the Supreme Court's ruling in *Renne v. Geary,* plaintiffs sought to have section 6(b) declared unconstitutional in Sacramento Superior Court. The Superior Court denied relief finding that the dispute was not yet ripe for review because plaintiffs had not demonstrated a sufficient threat of injury. (Decl. of Joseph Remcho, filed May 27, 1994, Ex. A).

Subsequently, the California Democratic Party prepared a mailer in support of Michael Woo, a candidate for the nonpartisan office of Mayor of Los Angeles in the June 1993 election. Shortly before the election, the California Republican Party and an individual, Tirso del Junco, filed a lawsuit in the Superior Court of Sacramento County seeking an injunction prohibiting sending the mailer in support of Woo, on the grounds that it was violative of section 6(b). *Del Junco v. Democratic Party of California,* No. 534020 (Super. Ct. Sacramento County, 1993) (the "Woo action"). On June 1, 1993, the Sacramento Superior Court, Judge Joe S. Gray presiding, entered a preliminary injunction, prohibiting the California Democratic Party from endorsing Woo. (Remcho Decl. at Ex. C).

In response, the California Democratic Party filed a petition for writ of mandate in the California Court of Appeal, Third Appellate District, seeking an immediate stay and reversal of the Superior Court's order. *Democratic Party of California v. Superior Court,* 3 Civil No. CO 16017 (1993). The Court of Appeal declined to stay the injunction, but after the election the Court of Appeal granted an alternative writ of mandate and ordered expedited briefing on the merits of the petition. Although briefing was completed in August 1993, the Court of Appeal had neither scheduled oral argument nor taken any action in the case at the time this lawsuit was filed in May 1994.

At its 1994 statewide convention, the California Democratic Party decided to support Delaine Eastin for State Superintendent of Public Instruction in the June 7, 1994, primary election. This is a nonpartisan office. The party produced a slate mailer endorsing Eastin and other candidates. (Decl. of Susan P. Kennedy, filed May 27, 1994, Ex. A).

On May 13, 1994, plaintiffs filed the present action against the California Republican Party, Tirso Del Junco, and the Attorney General of California, seeking declaratory and injunctive relief. Counsel for plaintiffs gave counsel for the California Republican Party a copy of the complaint. On May 25, 1994, California Republican Party counsel informed plaintiffs that it intended to seek a superior court order, pursuant to the superior court's reservation of jurisdiction in the Woo action, to halt distribution of the slate mailer supporting Eastin. A hearing was held on the matter in the Superior Court of Sacramento County on May 26, 1994, and concluded with Judge Gray *granting* the California Republican Party's application for a temporary restraining order enjoining the California Democratic Party from sending the slate mailers supporting Eastin. (Remcho Decl. at Ex. E). Prior to the issuance of the state court temporary restraining order, the California Democratic Party mailed about seventy-five percent of the mailers.

On May 27, 1994, plaintiffs applied to this Court for a temporary restraining order prohibiting defendants from enforcing section 6(b) against them. On June 1, 1994, General Duty Judge Claudia Wilken held a hearing on the matter and entered the requested temporary restraining order.

## II.

### A.

Before addressing the parties' arguments concerning the issuance of a preliminary injunction, it is necessary to examine the various justiciability concerns raised by the Attorney General in his opposition papers.

#### 1.

■ The Attorney General first suggests that, given the dismissal of the California

Republican Party and Tirso del Junco from this lawsuit, there is no case or controversy between the remaining parties adequate to provide the Court with jurisdiction. This argument lacks merit.

The Attorney General's participation in prior enforcement actions initiated by private parties,[3] his present opposition to the requested preliminary injunction and his desire to bring an enforcement action against plaintiffs in state court—his apparent preferred litigation forum, all demonstrate that the threat of injury to plaintiffs is "sufficiently real and immediate to show an existing controversy." *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *see also Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974).

Despite his prior practice of delegating enforcement of section 6(b) to private parties, the Attorney General has clearly experienced a change of heart and now expresses a clear intent to vigorously litigate any challenges to the provision. *See* Def.'s Opp. to Prelim. Inj., filed July 14, 1994, at 5:12–16.

In sum, plaintiffs wish to support Delaine Eastin and other candidates for nonpartisan offices in the upcoming election, and the Attorney General hopes to stop them. Despite the dismissal of two defendants, an active case and controversy remains between the parties sufficient to satisfy the jurisdictional mandates of Article III. *N.A.A.C.P. v. City of Richmond,* 743 F.2d 1346, 1350 (9th Cir. 1984).

### 2.

The Attorney General next maintains that the case, as initially presented, warranted abstention under the principles first set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Under this doctrine, a federal court must abstain from exercising jurisdiction over a federal action if (1) there are concurrent, "ongoing" state proceedings; (2) the proceedings implicate important state interests; and (3) the state proceedings provide an adequate opportunity to raise federal questions. *Beltran v. California,* 871 F.2d 777, 781 (9th

Cir.1988). *Younger* abstention embodies "a strong federal policy against federal court interference with *pending* state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 431, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (emphasis added).

At the June 1, 1994, hearing on the application for the temporary restraining order, Judge Wilken discussed the *Younger* abstention issue at some length. Although Judge Wilken recognized that *Younger* abstention was implicated, given the pendency of a state court injunction, she expressed her belief that two exceptions to the doctrine were present that enabled her to issue the temporary restraining order.

First, she noted the possibility that the law presently being challenged falls within the exception for laws that are "'flagrantly and patently violative of express constitutional provisions....'" *Younger,* 401 U.S. at 53–54, 91 S.Ct. at 755 (quoting *Watson v. Buck,* 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941)); *see, e.g., Orazio v. Town of North Hempstead,* 426 F.Supp. 1144 (E.D.N.Y.1977) (court applied this exception to the *Younger* doctrine to enjoin enforcement of a local ordinance regulating wall signs against a political candidate). Second, she suggested that the repeated inability of plaintiffs to receive a full hearing on the merits in state court raised the possibility that they were procedurally barred from receiving relief in that forum. *See Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521. Judge Wilken's temporary restraining order enabled the California Democratic Party to distribute the remaining twenty-five percent of the Eastin mailers to their membership.

The Attorney General attacks Judge Wilken's issuance of the temporary restraining order, arguing that *Younger* abstention was justified. There are several problems with this line of attack. First, the Attorney General ignores the fact that, at the time of the June 1 temporary restraining order, there was no state court action involving plaintiff Sacramento County Democratic Central

---

**3.** In briefing before the Court of Appeal, the Attorney General argued that section 6(b) was

constitutional. *See* Def.'s Opp. to Application for TRO, filed June 1, 1994, at Ex. 1.

Committee, and consequently no grounds for *Younger* abstention with respect to it. Thus, even had Judge Wilken concluded that *Younger* abstention barred the California Democratic Party from proceeding with a federal complaint, the Sacramento County Democratic Central Committee would have been free to pursue at least some version of the present action in this Court.

Next, since the issuance of the temporary restraining order on June 1, discussions between the California Democratic and Republican Parties have resulted in the dismissal of the Woo action, including Judge Gray's May 26, 1994, injunction pertaining to Delaine Eastin.[4] Because of the dismissal of the Woo action, there is no longer any litigation concerning the constitutionality of section 6(b) pending in state court. Therefore, the first requirement for *Younger* abstention, that there be concurrent, "ongoing" state proceedings, is not met, and the *Younger* issue is now moot.

Finally, Judge Wilken issued the temporary restraining order on June 1, 1994, and the Woo action was not dismissed until July 19, 1994. The Attorney General had ample opportunity to appeal Judge Wilken's temporary restraining order during the intervening seven weeks, but chose not to.

Despite these changed circumstances, the Attorney General invites the Court to invoke a form of equitable *Younger* abstention. He argues that Judge Wilken improvidently granted a temporary restraining order, and that, regardless of the fact that the concurrent state proceedings have now been dismissed, the Court should nevertheless dismiss the case so as not to reward plaintiffs' tactics in eliminating the *Younger* problem.

The Court declines the Attorney General's invitation. The fact remains that, as the case currently stands, there are no grounds for *Younger* abstention. Although the Attorney General may feel like a pawn caught between the legal maneuvers of the two political parties, his complaint rings hollow in the light of his explicit policy of delegating enforcement of section 6(b) to private parties.[5] When the Attorney General, a named defendant in this action, made the decision to allow the California Republican Party to lead the defense, he took the risk that at some point his interests and those of the California Republican Party would diverge. The fact that those interests did diverge, leading to a tactical victory for plaintiffs on the *Younger* abstention issue, is no reason for the Court to intervene at this juncture.

3.

Next, the Attorney General suggests that *Pullman* abstention may be appropriate in this matter. *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Under the *Pullman* doctrine, a district court may abstain from exercising jurisdiction over a case "when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984); *see also Cedar Shake & Shingle Bureau v. City of Los Angeles,* 997 F.2d 620, 622 (9th Cir.1993). The doctrine creates a very narrow exception to a district court's "virtually unflagging obligation" to exercise jurisdiction. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976).

A fundamental prerequisite to *Pullman* abstention is that "a definitive ruling on the state issues by a state court could obviate the need for a constitutional adjudication by the federal court. . . ." *Cedar Shake,* 997 F.2d at

---

4. In addition, plaintiffs have voluntarily dismissed both the California Republican Party and Tirso del Junco as defendants in this case. Only one defendant—the Attorney General of California—remains.

5. In a letter dated March 26, 1992, Deputy Attorney General Ted Prim wrote: "Historically, it has been the position of this office that constitutional and statutory provisions relating to a polit-

ical party organization's endorsement of a partisan or nonpartisan candidate is a matter beyond the independent jurisdiction of the Attorney General. We have taken the view that these provisions are subject to private remedy primarily by aggrieved members of party organizations." (*See* letter from Ted Prim, California Deputy Attorney General, to George Waters, Esq. (Mar. 26, 1992), Ex. 3 to Compl.).

622 (quoting *Kollsman v. City of Los Angeles,* 737 F.2d 830, 833 (9th Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985)). Such is not the case here. The Attorney General has presented no plausible interpretation of section 6(b) that would obviate the First Amendment concerns raised by plaintiffs' complaint. Indeed, on two occasions, a California superior court has interpreted the language of section 6(b) as plainly as it appears—holding that it forbids party endorsements of candidates for nonpartisan office. Thus, there is no indication that the state courts are prepared to interpret the provision in a manner that skirts the First Amendment. *See, e.g., Lind v. Grimmer,* 30 F.3d 1115, 1121 (9th Cir. 1994) (abstention only proper "if statute at issue is 'fairly subject' to an interpretation that will save it from invalidation") (citation omitted).

Finally, the Attorney General maintains that this Court should use the *Pullman* doctrine as a means to follow the Supreme Court's suggestion that this matter be adjudicated in state court. *Renne v. Geary,* 501 U.S. at 323, 111 S.Ct. at 2339–40. A review of the Court's opinion, however, reveals that it felt that state court rulings might help resolve some of the justiciability concerns that tainted the case presented to it. More specifically, the Supreme Court was concerned with whether section 6(b) applied to individual committee members and, thus, whether they had standing to bring the suit. *Id.* at 323, 111 S.Ct. at 2339–40. In addition, the Court suggested that state court litigation could help further define the terms, "endorse, support, or oppose." *Id.*

In light of the litigation that has transpired since the Supreme Court's ruling, there can be little doubt that section 6(b) applies to political parties intending to communicate endorsements to their members through private mailings. Unlike the complaint presented in *Renne v. Geary,* the plaintiffs in this action have identified specific candidates that they seek to endorse in a specific manner for specific offices in the upcoming fall election.

While the Attorney General may prefer to litigate this action in state court, he has cited no precedent sufficient to justify abstention. Furthermore, such a decision would unnecessarily deny plaintiffs the opportunity to litigate in their chosen forum and oust this Court of jurisdiction over an important federal constitutional issue. The Ninth Circuit very recently addressed a similar issue in *Lind v. Grimmer,* which involved a First Amendment challenge to a state statute that mandated the confidential treatment of citizen complaints concerning alleged campaign finance violations. Upholding the district court's decision not to abstain under the *Pullman* doctrine, the Ninth Circuit noted:

> [a] federal court should abstain only in exceptional circumstances, and only where the complaint involves sensitive areas of social policy that courts ought not to enter. While campaign spending regulation may qualify as an area that federal courts should avoid if possible, [the statute] does not regulate campaign spending. It regulates speech about campaign spending. This is not an area of peculiarly local concern, but an area primarily of federal concern.

30 F.3d at 1121 (9th Cir.1994) (citations omitted).

Similarly here, section 6(b) does not simply regulate the manner in which nonpartisan elections are conducted. It regulates speech about nonpartisan elections. A federal court is the appropriate forum in which to adjudicate the constitutionality of such a provision.[6]

### B.

#### 1.

To obtain a preliminary injunction, a movant must show: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury if the injunction is not granted; (3) the balance of hardships favors the moving party; and (4) the public interest favors granting relief. *Regents of University*

---

**6.** The Court also rejects the Attorney General's request that it dismiss this action based on the abstention principles set forth in *Colorado River Water Conservation Dist. v. United States,* 424

U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The absence of duplicative state court proceedings renders the doctrine inapplicable.

*of California v. American Broadcasting Co., Inc.,* 747 F.2d 511, 515 (9th Cir.1984).

■ A party may meet the burden under these four factors by demonstrating either: (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions of law are raised and the balance of hardships tips sharply in the moving party's favor. *Id.* "The critical element ... is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Benda v. Grand Lodge,* 584 F.2d 308, 315 (9th Cir.1978), *cert. denied,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). Finally, the Ninth Circuit has held that a "'serious question' as one as to which the moving party has 'a fair chance of success on the merits.'" *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1421 (9th Cir.1984) (quoting *Benda,* 584 F.2d at 315).

### 2.

■ To establish a likelihood of success on the merits, plaintiffs must demonstrate that section 6(b) interferes with their rights to free speech and association guaranteed by the First Amendment and that the state will not be able to bear its burden of establishing that the provision is necessary to serve a compelling state interest. *See Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983).

There is little doubt that section 6(b) implicates vital First Amendment concerns. Indeed, the Supreme Court has stated that "[o]ur form of government is built on the premise that every citizen shall have the right to engage in political expression and association." *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). "Because '[e]xercise of these basic freedoms ... has traditionally been through the media of political associations,' political parties as well as individual

adherents enjoy First Amendment rights." *San Francisco County Democratic Cent. Comm. v. Eu,* 826 F.2d 814, 818 (9th Cir. 1987), *aff'd,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), (citing *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 212–16, 107 S.Ct. 544, 548–49, 93 L.Ed.2d 514 (1986)). Furthermore, the Court has held that "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy,* 354 U.S. at 250, 77 S.Ct. at 1212.

Section 6(b)'s ban on partisan endorsements in nonpartisan elections directly restrains the political speech that rests "at the core of our electoral process and ... First Amendment freedoms." *Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968). As the Supreme Court has recognized, "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989).[7] The ban on endorsements "prevents party governing bodies from stating whether a candidate adheres to the tenets of the party or whether party officials believe that the candidate is qualified for the position sought." *Id.* at 223, 109 S.Ct. at 1020. It also infringes their memberships' companion right to receive information that is similarly guaranteed by the First Amendment. *Kleindienst v. Mandel,* 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581–82, 33 L.Ed.2d 683 (1972).

Because the challenged provision burdens the right of political parties and their members to communicate freely concerning the merits of particular candidates, "it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest, and is narrowly tailored to serve that interest." *Eu,* 489 U.S. at 222, 109 S.Ct. at 1019 (citations omitted).

In this regard, the Attorney General argues that section 6(b) advances a compelling state interest by preserving the nonpartisan

---

**7.** In *Eu,* the Supreme Court affirmed a decision by the Ninth Circuit holding that California's ban on political party endorsements in *partisan* elections is unconstitutional. The Attorney General maintains that this case is distinguishable from *Eu* because the state has a compelling interest in keeping nonpartisan elections free from the corruptive influence of partisan endorsements.

nature of California's method of electing local and judicial officials and by maintaining the fair and impartial administration of government. The Attorney General believes that section 6(b) serves this interest well by insulating both the voter and the nonpartisan candidate from the potentially corruptive influence of partisan endorsements. He maintains that this protective buffer is essential in elections for nonpartisan positions where the voters want independent thinkers to serve the public free from covert allegiances to party bosses.

Thus, the Attorney General argues that the endorsement ban will ensure that those who hold nonpartisan office are controlled by the people rather than the political parties who otherwise could secure their indebtedness through valuable pre-election endorsements. To support his position, he cites several Supreme Court decisions in which the Court has upheld restrictions on campaign contributions and spending. *See, e.g., Austin v. Michigan State Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1975).

The Attorney General's reliance on these cases is misplaced. The risk of corruption that justified limits on campaign financing is not the same type of corruption to which the Attorney General claims that partisan endorsements in nonpartisan elections will lead. To adopt his position, the Court would have to agree that "the State has an interest in protecting 'the people' from their own susceptibility to being influenced by political speech." *Renne v. Geary,* 501 U.S. 312, 348, 111 S.Ct. 2331, 2353, 115 L.Ed.2d 288 (Marshall, J., dissenting.)

Addressing the merits of section 6(b) in his dissent in *Renne v. Geary,* Justice Marshall clearly underscored the important difference between the state interest that justifies limits on campaign financing and those proffered by California to defend the proscription of partisan endorsements contained in section 6(b). He noted:

We upheld the constitutionality of [the campaign finance] law [in *Austin* ], finding that a State could legitimately prohibit 'the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.'

\* \* \* \* \* \*

The political activity that § 6(b) limits in this case is not the expenditure of money to further a viewpoint but merely the announcement of that viewpoint in the form of an endorsement. It is difficult to imagine how a political party's announcement of its view about a candidate could exert an influence on voters that has 'little or no correlation to the public's support for the [party's] political ideas.' On the contrary, whatever influence a party wields in expressing its views results directly from the trust that it has acquired among voters.

*Id.*

As Justice Marshall recognized, the corruption that the Attorney General argues section 6(b) prevents occurs only because voters are genuinely interested in hearing the opinions of the political party to which they belong. Unlike the corruption wrought by huge corporate campaign contributions through which a corporation may succeed in securing a politician's support for positions that the public at large does not support, the only reason that a political party's endorsement is valuable is because a candidate knows that the party's position on issues necessarily corresponds with the views held by its membership. As Justice Marshall succinctly put it, "the prospect that voters might be persuaded by party endorsements is not a *corruption* of the democratic political process; it *is* the democratic political process." *Id.* at 349, 111 S.Ct. at 2353–54 (emphasis in original).

In addition, although not expressly raised by the Attorney General in his opposition papers, in previous litigation concerning the constitutionality of section 6(b), parties have argued that the provision finds support in a series of Supreme Court decisions upholding restrictions designed to ensure orderly elections. *See, e.g., Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (upholding limits on the number of candidates

on the ballot); *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) ((upholding minimum standards for candidates to get onto ballot); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (upholding requirement that candidate demonstrate a "significant modicum of public support"). This reliance is also misplaced.

As the Ninth Circuit recognized in *Eu,* although the state may have an interest in ensuring that its elections are conducted in an orderly fashion, such restrictions may not unnecessarily interfere with political parties whose

> survival depends upon [their] ability to compete in the free marketplace of political ideas and ideals. The First Amendment limits states to a neutral role in that competitive process. A state may not interfere with the associational rights of political parties beyond what is necessary to assure honest and orderly elections.

826 F.2d at 831. At this juncture, the Attorney General has offered no evidence that section 6(b)'s ban on partisan endorsements in nonpartisan elections is essential "to assure honest and orderly elections." In addition, it is clear that the section's ban on pure speech is decidedly different than the restrictions concerning the mechanics of conducting an election that the Supreme Court upheld in the cases cited above.

Finally, both the Ninth Circuit panel that upheld section 6(b) and the dissenters to the *en banc* decision striking down the provision, relied, in part, on the Supreme Court's decision in *Civil Service Commission v. National Assoc. of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). A review of the opinion, however, reveals that the case is distinguishable in several important respects.

In *Letter Carriers,* the Court reviewed the Hatch Act, 5 U.S.C. § 7324 *et seq.,* which prohibits federal employees from taking "an active part in political management or in political campaigns." 5 U.S.C. § 7324(a)(2). Several individual federal employees, a union, and certain local Democratic and Republican committees challenged the act as unconstitutional on its face. The Act, as interpreted through federal regulations, prohibited federal employees from participating in a whole host of political activities, including:

> organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a partisan candidate for, or campaigning for, an elective public office; actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating committee petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention.

*Id.* at 556, 93 S.Ct. at 2886.

The Court upheld the Act's restrictions on the political activities of federal employees finding that it served several important interests. First, the Court noted that "federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees on others and on the electoral process should be limited." *Id.* at 557, 93 S.Ct. at 2886.

Second, the Court noted that the restrictions were necessary to ensure that federal employees "appear to the public to be avoiding [practicing political justice], if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Id.* at 565, 93 S.Ct. at 2890. Finally, the Court held that the Act was necessary to "make sure that Government employees would be free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." *Id.* at 566, 93 S.Ct. at 2890–91.

Although broadly standing for the premise that political activities can be restricted to ensure that laws and government programs are enforced "without bias or favoritism for or against any political party or group or the members thereof", *Id.* at 565, 93 S.Ct. at 2890, *Letter Carriers* is distinguishable from the case presented for several reasons.

First, a review of the Court's opinion and the Hatch Act make clear that the restrictions at issue were aimed at political conduct

as opposed to speech. As the Court noted, "[w]e agree ... that plainly identifiable acts of political management and political campaigning on the part of federal employees may constitutionally be prohibited." *Id.* at 567, 93 S.Ct. at 2891. Indeed, the Act expressly provides that the employee "retains the right to vote as he chooses and to express his opinion on political subjects and candidates." *Id.* at 575–576, 93 S.Ct. at 2895–96 (quoting 5 U.S.C. § 7324(b). In addition, the Act exempts an employee's non-partisan activity from its coverage. *See* 5 U.S.C. § 7326.

The Court noted that the federal regulations interpreting the Hatch Act included within its list of prohibited activities the endorsement of a partisan candidate for public office in an advertisement or campaign literature. 5 C.F.R. § 733.122(a)(10). Although the Court recognized that the regulatory ban on endorsements conflicted somewhat with the Act's provision leaving an employee free "to express his opinion on ... candidates," it concluded that endorsements and speeches "are political acts normally performed only in the context of partisan campaigns by one taking an active role in them, and ... [the regulation's restrictions on them] do not ... render the remainder of the statute vulnerable by reason of overbreadth." *Id.* at 580, 93 S.Ct. at 2898. As such, in the special context of a facial challenge, the Court did not consider the possibility that the Act might be used to prohibit an employee from endorsing a candidate as sufficient to render the entire Act "substantially overbroad."

Next, the Hatch Act sought to control the political activities of federal employees to prevent potential harms that might result directly from an employee's participation in those activities. In other words, the Act prohibits an employee from participating in the management of a political campaign based on the fear that such participation might influence the employee in the performance of her job.

In contrast, section 6(b) attempts to regulate the activity of third-party political organizations based on the fear that these activities may influence others, such as voters and candidates. Unlike the Hatch Act, section 6(b)'s method of preventing its targeted harm is more attenuated, and consequently, more troublesome in the context of the First Amendment. As the Court noted in *Letter Carriers*, "the government has an interest in regulating the conduct and 'the speech of its employees that differ[s] significantly from those it possesses in connection with the regulation of the speech of the citizenry in general....'" *Id.* at 564, 93 S.Ct. at 2890. In the present matter, section 6(b) regulates the speech of political parties and their members—"speech of the citizenry in general."

Finally, the "appearance of impropriety" that both the Hatch Act and section 6(b) arguably seek to address is also different. While the public expects federal employees to perform their jobs in an impartial manner, no one expects political parties to act in anything but a partisan manner during an election. Although the public may expect nonpartisan candidates and officeholders to act impartially, section 6(b)'s ban on speech is not directed at them.

Plaintiffs have demonstrated a likelihood of success on the merits by raising "serious questions" regarding the constitutionality of section 6(b) which the Attorney General has failed to rebut at this stage in the proceedings.

### 3.

■ Having demonstrated a likelihood of success on the merits, plaintiffs must next show that they will suffer irreparable harm if the preliminary injunction does not issue.

There can be little question that unless the Court issues a preliminary injunction authorizing the distribution of plaintiffs' endorsement mailers, plaintiffs' opportunity to speak in the upcoming fall election will almost certainly be lost forever. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *see also Service Employees Int'l Union v. FPPC*, 721 F.Supp. 1172, 1180 (E.D.Cal.1989) ("[T]he [Supreme] Court has taught that the abridgement of First Amendment freedoms constitutes irreparable injury."). The prior restraint doctrine, which

creates a virtually irrebuttable presumption against enjoining speech, demonstrates the magnitude of the harm inherent in the suppression of political speech.

In contrast to the concrete, well-recognized harm incident to the curtailment of political speech, the alleged harm that the people of California will suffer if partisan dialogue is injected into a nonpartisan campaign is wholly speculative in nature. The Attorney General has offered little evidence to support his position that the balance of hardships tips in favor of denying the requested injunction. He has not submitted a single declaration from a voter, officeholder, or candidate to attest to the purported harm that will result if this Court allows plaintiffs to communicate endorsements to their members. Given that up until 1986, political parties were free to endorse candidates for nonpartisan office, it would seem that evidence of the "corruptive" influence of such endorsements would be readily available.

The Attorney General makes much of the fact that the original Ninth Circuit panel in *Geary v. Renne* stayed the district court's order enjoining section 6(b) pending its own review of the provision. The Attorney General insists that the panel's issuance of a stay indicates that the Ninth Circuit felt the state would suffer irreparable harm if a provision of its constitution were enjoined pending final appellate review and that such interim interference with the electoral process was inappropriate. The Court declines to participate in such guesswork. The presence of an unexplained stay in the appellate record is just one more piece of speculative evidence insufficient to rebut plaintiffs' demonstrated concrete injury.

In addition, it is noteworthy that section 6(b) does not prohibit special interest groups, political action committees or individuals from endorsing nonpartisan candidates. As such, the potential harm of an order preliminarily allowing plaintiffs to endorse their chosen candidates pending a trial in this matter is incremental at best.

Accordingly,

**IT IS HEREBY ORDERED** that:

1. Pending final judgment in this matter or until further order of this Court, the Attorney General, his officers, agents, servants, employees, attorneys and all persons acting under, in concert with, or for him, are, and each is, enjoined from enforcing Article II, section 6(b) of the California Constitution to prevent plaintiffs from endorsing or supporting Delaine Eastin for State Superintendent of Public Instruction or any other candidates for nonpartisan office; and

2. The $1,000 bond plaintiffs posted in connection the temporary restraining order shall serve as security for the preliminary injunction.

Dated: August 4, 1994.