**CALIFORNIA DEMOCRATIC PARTY; Bill Press; Susan Kennedy; San Francisco County Democratic Central Committee; Carole Migden; Sacramento County Democratic Central Committee; Rita Hodgkins; and Douglas Denton, Plaintiffs,**

v.

**Daniel LUNGREN, Attorney General of the State of California, California Republican Party; Tirso Del Junco; and Does 1 through 20, inclusive, Defendants.**

No. C–94–1703.

United States District Court, N.D. California.

March 15, 1996.

Joseph Remecho, Jamet E. Sommer, John A. Lewis, Remcho, Johansen & Purcell, San Francisco, CA, for Plaintiffs.

Daniel G. Stone, Deputy Attorney General, Sacramento, CA, for defendant Lungren.

James R. Parrinello, John E. Mueller, Nielsen, Merksamer, Hodgson, Parrinello & Mueller, Mill Valley, California, for defendants California Republic Party and Del Junco.

## OPINION AND ORDER

ORRICK, District Judge.

Article II, section 6(b) of the Constitution of the State of California bars party endorsements of candidates for so-called nonpartisan elective offices. The question raised by cross-motions for summary judgment now before the Court is whether section 6(b) vio-

lates the First Amendment to the Constitution of the United States. The Court holds that it does, and for the reasons set forth herein grants plaintiffs' motion and denies defendants' motion.

## I.

The efforts exerted by both parties to get the basic question of section 6(b)'s constitutionality settled have a long and tortured history in both state and federal court, which is recorded in some detail in a prior opinion of this Court. *California Democratic Party v. Lungren,* 860 F.Supp. 718, 719–20 (N.D.Cal.1994). For purposes of this Opinion, a few highlights will suffice.

Section 6(b) prohibits political parties from endorsing, supporting, or opposing candidates for nonpartisan office. Cal. Const. Art. II, § 6. It was enacted in 1986 through a voter initiative. That initiative had its genesis in an attempt to overturn the California Supreme Court's decision interpreting the predecessor provision of section 6(b) as not prohibiting political parties from endorsing candidates for nonpartisan offices. *See Unger v. Superior Court,* 37 Cal.3d 612, 209 Cal.Rptr. 474, 692 P.2d 238 (1984).

Section 6(b) was challenged once before in this Court.[1] *Geary v. Renne,* 708 F.Supp. 278 (N.D.Cal.1988) (*"Geary I"*), rev'd, 880 F.2d 1062 (9th Cir.1989) (*"Geary II"*), rev'd on reh'g en banc, 911 F.2d 280 (9th Cir.1990) (*"Geary III"*), vacated on other grounds sub nom. *Renne v. Geary,* 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (*"Geary IV"*).[2]

The Ninth Circuit, sitting *en banc,* declared section 6(b)'s ban on nonpartisan endorsements unconstitutional and upheld the permanent injunction entered by the district court. *Geary III,* 911 F.2d at 280. The Supreme Court, however, vacated the Ninth Circuit's *en banc* decision on jurisdictional grounds, concluding that the case was not ripe, because the individuals challenging the law had not alleged "an intention to endorse any particular candidate." *Geary IV,* 501 U.S. at 321, 111 S.Ct. at 2339.[3]

As a prelude to this action, the California Democratic Party decided to support Delaine Eastin for State Superintendent of Public Instruction, a nonpartisan office, in the June 7, 1994, primary election. The Party produced a slate mailer endorsing Eastin and other candidates. Anticipating a challenge, the Party together with the other plaintiffs filed this action on May 13, 1994.

On May 25, 1994, the Republican Party sought a TRO from Sacramento Superior Court to halt distribution of the Democratic Party's slate mailer supporting Eastin. The Superior Court granted the application for a TRO the following day.

On May 27, 1994, plaintiffs applied in this Court for a TRO to prevent defendants from enforcing section 6(b) against them. The TRO was granted on June 1, 1994.

This Court subsequently granted plaintiffs' motion for a preliminary injunction on August 5, 1994, thereby allowing plaintiffs to endorse Eastin and other candidates for nonpartisan offices in the fall 1994 elections.

---

**1.** It has also been challenged in state court. In 1993, the Democratic Party endorsed Michael Woo for Mayor of Los Angeles (a nonpartisan office). Shortly before the election, the Republican Party sought a temporary restraining order ("TRO") prohibiting the Democratic Party from supporting Woo. The TRO was granted. *Del Junco v. Democratic Party of Cal.,* No. 534020 (Super.Ct. Sacramento County 1993). In response, the Democratic Party filed a petition for writ of mandate in the California Court of Appeal, Third Appellate District, seeking an immediate stay and reversal of the Superior Court's order. The Court of Appeal denied both emergency relief and the request for an expedited hearing and decision. *Democratic Party of Cal. v. Superior Court,* No. CO 16017 (Ct.App.3d Dist. 1993).

**2.** On April 27, 1988, the late Judge Alfonso J. Zirpoli concluded that section 6(b) violated plaintiff's free speech rights under the Constitution and permanently enjoined its enforcement. *Geary I,* 708 F.Supp. at 278. That decision was overturned on appeal by a divided panel of the Ninth Circuit. *Geary II,* 880 F.2d at 1062. Subsequently, the Ninth Circuit reheard the case en banc and affirmed Judge Zirpoli's decision. *Geary III,* 911 F.2d at 280. That decision was vacated by the Supreme Court because the case was unripe. *Geary IV,* 501 U.S. at 312, 111 S.Ct. at 2333.

**3.** Thus, the Ninth Circuit's en banc decision in *Geary III* has no precedential value, though it obviously offers some insight into how the Ninth Circuit might rule on the issue in the future.

*California Democratic Party,* 860 F.Supp. at 724, 727.

Plaintiffs now move for summary judgment, arguing that section 6(b) is unconstitutional on its face. Defendants likewise seek summary judgment, contending that section 6(b) is clearly *not* unconstitutional. In the alternative, defendants request that the Court uphold the statute insofar as it affects campaigns for elective judicial offices.

## II.

■ "Congress shall make no law ... abridging the freedom of speech...." U.S. Const., amend. I. The First Amendment applies to the states as well by virtue of the Due Process Clause of the Fourteenth Amendment. *See, e.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 908 n. 43, 102 S.Ct. 3409, 3423, 73 L.Ed.2d 1215 (1982).

■ To assess the constitutionality of a state election law such as section 6(b), the Court must first determine whether it burdens free speech rights protected by the First and Fourteenth Amendments. *Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 222, 109 S.Ct. 1013, 1019–20, 103 L.Ed.2d 271 (1989). "If the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest, and is narrowly tailored to serve that interest." *Id.* (citations omitted).

## A.

■ Article II, section 6 of the California Constitution provides as follows:

(a) All judicial, school, county, and city offices shall be nonpartisan.

(b) No political party or party central committee may endorse, support, or oppose a candidate for nonpartisan office.

Cal. Const. Art. II, § 6.

■ "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association." *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). Because individuals exercise their free speech rights by participating in political parties, political parties also possess First Amendment rights. *San Francisco County Democratic Cent. Comm. v. Eu,* 826 F.2d 814, 818 (9th Cir.1987), *aff'd,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (citing *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 212–16, 107 S.Ct. 544, 547–49, 93 L.Ed.2d 514 (1986)). Indeed, "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy,* 354 U.S. at 250, 77 S.Ct. at 1212.

At issue here is the speech of political parties during campaigns for elective office. The Supreme Court has explained that protection of such speech is especially important:

We have recognized repeatedly that "debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo,* 424 U.S. 1, 14 [, 96 S.Ct. 612, 632, 46 L.Ed.2d 659] (1976) (per curiam). Indeed, the First Amendment "has its fullest and most urgent application" to speech uttered during a campaign for political office. *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272 [, 91 S.Ct. 621, 625, 28 L.Ed.2d 35] (1971).

*Eu,* 489 U.S. at 223, 109 S.Ct. at 1020 (some citations omitted).

The Court finds, as it did previously, that section 6(b) unquestionably imposes a direct and substantial burden on core political speech. *California Democratic Party,* 860 F.Supp. at 724. Accordingly, the Court must apply strict scrutiny, that is, defendants must show that section 6(b) advances a compelling state interest and is narrowly tailored to serve that interest. *Eu,* 489 U.S. at 222, 109 S.Ct. at 1019–20.

## B.

Defendants argue that California is entitled (1) to protect its nonpartisan election process from becoming partisan and (2) to create a "level playing field" for potential candidates for nonpartisan office. The foundation for these arguments is California's sovereign right to control its election process

for state officers. *See Tashjian,* 479 U.S. at 217, 107 S.Ct. at 550.

■ California's broad authority to regulate state elections, however, " 'does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.' " *Eu,* 489 U.S. at 222, 109 S.Ct. at 1019 (quoting *Tashjian,* 479 U.S. at 217, 107 S.Ct. at 550). Indeed, California's "power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights." *Tashjian,* 479 U.S. at 217, 107 S.Ct. at 550.[4]

Defendants argue that nonpartisan offices were created, at least in part, to combat the corruption of the process caused by the influence of the major political parties; therefore, section 6(b) is essential to preventing corruption of nonpartisan offices.

This argument is misplaced. *See California Democratic Party,* 860 F.Supp. at 725. The type of "corruption" contemplated by the California Attorney General, *viz.,* the potential for political parties' speech to influence voters, is wholly different from the risk of corruption that justified limits on campaign *financing. Id.; see Geary III,* 911 F.2d at 283–84. "Corruption is a subversion of the political process" whereby "[e]lected officials are influenced to act contrary to their obli-

gations of office by the prospect of *financial gain* to themselves or infusions of *money* into their campaigns." *Federal Election Comm'n v. National Conservative Political Action Comm.,* 470 U.S. 480, 497, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985) (emphasis added).

What defendants characterize as "corruption" is, in fact, the heart of the political process itself. "The fact that candidates ... may alter or reaffirm their own positions on issues in response to political messages ... can hardly be called corruption, for one of the essential features of democracy is the presentation to the electorate of varying points of view." *Id.* at 498, 105 S.Ct. at 1469.

Judge Canby, in his dissent from the panel's decision in *Geary II,* underscores the argument that this Court accordingly adopts:

> To accept California's position ... is to accept the proposition that the voters, in acting favorably upon a political party endorsement, are *making a mistake.* They are attaching too much meaning, or the wrong meaning, to the party's endorsement. Knowing that a particular party supports a candidate, the voters improperly vote for that candidate and give rise to too much party influence over local affairs.... Consequently, [California] ...

4. The Supreme Court has allowed the states to impose certain types of restrictions necessary to ensure the orderly conduct of elections. *See California Democratic Party,* 860 F.Supp. at 725–26. For example, "[t]he Court has recognized that a State has a legitimate interest in regulating the number of candidates on the ballot." *Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972) (citing *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971); *Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968)). As Chief Justice Burger explained:

> In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections.... [W]e are bound to respect the legitimate objectives of the State in avoiding overcrowded ballots. Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies.

*Bullock,* 405 U.S. at 145, 92 S.Ct. at 857; *see also Lubin v. Panish,* 415 U.S. 709, 715–16, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974).

Such restrictions, however, are not without limits. The Supreme Court has cautioned that they must always be balanced against the voters' "right to elect legislators in a free and unimpaired fashion," *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1382, 12 L.Ed.2d 506 (1964), as well as the intertwined "right of a party or an individual to a place on a ballot." *Lubin,* 415 U.S. at 716, 94 S.Ct. at 1320. Thus, for example, the Court has struck down state laws imposing large filing fees on would-be candidates without providing any alternative means of ballot access. *Id.* at 718, 94 S.Ct. at 1320–21; *Bullock,* 405 U.S. at 149, 92 S.Ct. at 858–59.

The ban imposed by section 6(b) is readily distinguishable from the kinds of ballot restrictions that are aimed at preventing the "clogging of [the state's] election machinery." *Bullock,* 405 U.S. at 145, 92 S.Ct. at 857. Section 6(b) is a ban on pure speech, not a merely logistical regulation of how many and which candidates may be put on the official ballot. *California Democratic Party,* 860 F.Supp. at 726.

has prohibited statutory political parties from endorsing (or otherwise supporting) candidates in nonpartisan elections, and from publicizing such endorsements. Under our Constitution, however, that option is not open to California....

. . . . .

Properly viewed, the first amendment protects free expression as an end in itself. But even under a narrower, instrumental view of the first amendment, there is an irreducible core requirement. It is that political speech must be free so that the sovereign people can decide public issues. To posit that the people may decide incorrectly, and therefore should be denied information in order to steer their decisions, is to posit some other sovereign who can decide when the people are likely to be mistaken, and what they should be allowed to know. Little would be left of the first amendment under such a regime.

*Geary II,* 880 F.2d at 1083–84 (Canby, J., dissenting) (citation omitted). Thus, as a matter of law, the purported state interest in preventing voters from being unduly influenced by political party endorsements cannot meet strict scrutiny. Under any set of facts, that goal is not a compelling state interest; on the contrary, it is a wholly illegitimate one.

Defendants also contend that section 6(b) is essential to preserving the nonpartisan nature of the local, school, and judicial offices, avoiding the appearance of partiality, particularly of judges, and preventing the risk of partisan gridlock. In defendants' view, the endorsement of a political party creates the public perception that a candidate for nonpartisan office represents that party's agenda or is beholden to it in some way.

In support of this argument, defendants rely on *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). In *Letter Carriers,* the Supreme Court upheld the restrictions on political activities of federal employees imposed by the Hatch Act, 5 U.S.C. §§ 7324 et seq. Such restrictions were found to be justified by the government's interests in preventing (1) political influence to affect its employees and

(2) the appearance of partiality. *See id.* at 564–65, 93 S.Ct. at 2889–90.

The Court will assume, *arguendo,* that California has a compelling interest in preventing nonpartisan *officeholders* from engaging in conduct that tends to undermine the nonpartisan nature of their posts. Even so, section 6(b) misses the mark. The evil sought to be combatted is the unseemly partisanship of nonpartisan officeholders once they are in office, not the partisanship of political parties (which, of course, is the very nature of political parties). Section 6(b) purports to prevent officeholders from being "beholden" to political parties by imposing a ban on the *parties' speech about candidates* for office, rather than (as the Supreme Court approved in *Letter Carriers*) a ban on the *partisan political conduct of the officeholders themselves.* The distinction is crucial. The government has an interest in the manner in which its elected officials conduct themselves while in office. The government does not and cannot have a legitimate interest in silencing the speech of third parties about the qualifications and political views of candidates for those offices. *See Eu,* 489 U.S. at 223, 109 S.Ct. at 1020.

Defendants also claim that California has an interest in "leveling the playing field" for candidates in elections for nonpartisan offices. Their theory is that if parties are allowed to endorse candidates, then those candidates without party endorsements will be discouraged from running. The result, defendants contend, will be twofold: fewer candidates for nonpartisan office and an unauthorized, *de facto* primary process in which political parties "nominate" candidates by endorsing them.

The Court rejects this argument. California's desire to "level the playing field" for potential candidates by suppressing political parties' speech is not a compelling interest because it is entirely at odds with the First Amendment. The Supreme Court has rejected

the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others [as] wholly foreign to the First

Amendment, which was designed "to secure 'the widest possible dissemination of information from diverse and antagonistic sources,'" and "'to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"

*Buckley v. Valeo,* 424 U.S. 1, 48–49, 96 S.Ct. 612, 649, 46 L.Ed.2d 659 (1976) (per curiam) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 266, 269, 84 S.Ct. 710, 718–19, 720, 11 L.Ed.2d 686 (1964) (quoting *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945) and *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308–09, 1 L.Ed.2d 1498 (1957))).

Moreover, as a factual matter, the "level playing field" argument cannot succeed. Section 6(b) silences not only the two major political parties, but a myriad of smaller, less powerful parties as well, such as the Libertarian Party, the Peace and Freedom Party, and the Green Party.

Even if the Court were to assume that leveling the playing field is a compelling interest, section 6(b) is not narrowly tailored to achieve that goal. It does not silence political groups other than the political parties themselves. As a result, voters can receive campaign literature from any number of groups styling themselves as affiliates of political parties, though not the actual parties themselves, and "endorsing" particular candidates for nonpartisan office. (Lewis Decl. Ex. B.) Therefore, not only is section 6(b) not narrowly tailored, it actually increases the risk of voter confusion due to political groups masquerading as the official parties.

Indeed, plaintiffs have evidence of this phenomenon: Annemarie Conroy, a Republican running for the nonpartisan office of San Francisco County Supervisor, was listed as an "endorsed" candidate on a mailer called the "San Francisco Democratic Voter Checklist." (Berg Decl. ¶ 12 & Ex. D.) Because this Court's injunction was in place, the San Francisco Democratic Party was able to distribute its own mailer explaining that Conroy was not a Democrat and was not endorsed by the Democratic Party. (*Id.* ¶ 12 & Ex. E.) Nonetheless, it is likely that at least some voters were misled. Moreover, without the

injunction, the Democratic Party would have been unable to counter this misrepresentation because it would have been barred from "oppos[ing]" a candidate for nonpartisan office." Cal. Const. Art. II, § 6.

In addition, the argument that California is entitled to prevent the establishment of *de facto* primaries is unconvincing. The Court agrees with the reasoning of Judge Reinhardt in his concurrence in the en banc decision in *Geary III:*

> [T]here is all the difference in the world between refusing to delegate to political parties the decision as to which candidates appear on the general-election ballot [by conducting primaries] and prohibiting political party organizations from announcing their views on the merits of candidates seeking public office....
>
> The issue ... is not a matter of how to define or structure a "nonpartisan election." It is instead a question of the right of individuals to band together [in political parties] and express their collective views on a matter of public concern.

*Geary III,* 911 F.2d at 288 (Reinhardt, J., concurring) (footnote omitted); *see also Geary II,* 880 F.2d at 1085 (Canby, J., dissenting).

At the hearing, defendants argued that section 6(b) is analogous to the Supreme Court's decision in *Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). *Burson* involved a First Amendment challenge to a Tennessee statute prohibiting the solicitation of votes and the display and distribution of campaign literature within 100 feet of the entrance to a polling place. Acknowledging that the law was "not a facially content-neutral time, place, or manner restriction," 504 U.S. at 197, 112 S.Ct. at 1850, and was, therefore, subject to strict scrutiny, *id.* at 198, the Court nonetheless upheld the statute's constitutionality.

The Court concluded that "some restricted zone [around a polling place] [was] necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." *Id.* at 206, 112 S.Ct. at 1855. In addition, the Court found that empirical proof to justify the size of the boundary was

unnecessary and perhaps unobtainable. *Id.* at 208–09, 112 S.Ct. at 1856–57. The exact dimensions of such a zone did not determine whether the Tennessee law was narrowly tailored or not: The difference between a 100–foot zone and a 25–foot zone was not a question of constitutional proportions, but rather "a difference only in degree, not a less restrictive alternative in kind." *Id.* at 210, 112 S.Ct. at 1857. Noting that it takes about fifteen seconds to walk 100 feet, Justice Blackmun explained: "The State of Tennessee has decided that these last 15 seconds before its citizens enter the polling place should be their own, as free from interference as possible. We do not find that this is an unconstitutional choice." *Id.* (footnote omitted).

*Burson* lies at the current outer limits of the Supreme Court's jurisprudence on speech restrictions that are acceptable because of the states' interests in protecting the integrity of the voting process. Nevertheless, this Court finds that *Burson* does not extend far enough to reach this case.

Defendants' comparison of *Burson's* 100–foot zone to section 6(b)'s ban on party endorsements is unpersuasive. *Burson* is distinguishable because, like the ballot restriction cases, it is principally concerned with the *mechanics* of the voting process, i.e., the state's physical control over the polling place itself. Indeed, the Court's opinion discusses at length the origins of voting practices and the development of the "secret ballot secured ... by a restricted zone around the voting compartment[ ]." *See id.* at 200–06, 112 S.Ct. at 1852–55. Under *Burson*, the polling place is, in essence, an extension of the ballot itself. It is the private, protected sphere in which each individual is free to exercise that most fundamental of all our fundamental rights, the right to vote.[5] *Cf. Madsen v. Women's Health Center, Inc.,* — U.S. —,

——, 114 S.Ct. 2516, 2526–27, 129 L.Ed.2d 593 (1994) (upholding injunction imposing 36–foot "buffer zone" around health clinic where abortions were performed, within which anti-abortion protesters could not picket; "the State has a strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy") (citing *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)).

Tennessee's 100–foot zone exists only on election day. It is a highly focused and short-lived restriction on speech that surrounds only the polling place. Within its limits, it does not discriminate: No one is allowed to campaign. By contrast, section 6(b) is an absolute ban on only political parties' speech during the entire duration of every nonpartisan election.

The views of Judges Rymer, Alarcon, and Fernandez notwithstanding (*see Geary III,* 911 F.2d at 295–315 (opinions of Rymer, J., dissenting and Alarcon, J., dissenting)), section 6(b) is a patently unconstitutional abridgement of political parties' free speech rights. The effort, however well-meaning, to protect voters from themselves by silencing those voices perceived to be the most influential during a campaign cannot be reconciled with the free marketplace of ideas contemplated by the First Amendment. *See Buckley,* 424 U.S. at 49, 96 S.Ct. at 649. As Justice Marshall succinctly put it, "the prospect that voters might be persuaded by party endorsements is not a *corruption* of the democratic political process; it *is* the democratic political process." *Geary IV,* 501 U.S. at 349, 111 S.Ct. at 2353 (Marshall, J., dissenting).

### C.

In the alternative, defendants ask the Court to uphold section 6(b) insofar as it bans political party endorsements of candi-

---

5. "[T]he best way to preserve the secrecy of the ballot and safeguard the integrity of the election process is to limit access to the area around the voter." Ronald D. Rotunda, *A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.,* 47 SMU L.Rev. 9, 18 n. 57 (1993); *see also* Calvin R. Massey, *Hate Speech, Cultural Diversity, and the Foundational Paradigms of Free Expression,* 40 UCLA L.Rev. 103, 186 (1992) ("Tennessee did not fear what political speakers would

say so much as it feared that the very presence of political speech in close proximity to the polls would intimidate some voters into either not voting or casting a coerced ballot."); Richard Kirk Page & Kay Hartwell Hunnicutt, *Freedom for the Thought We Hate: A Policy Analysis of Student Speech Regulation at America's Twenty Largest Public Universities,* 21 J.C. & U.L. 1, 25–26 (1994) (same).

dates for state judicial office. Defendants argue, quite rightly, that it is especially crucial for judges to avoid the appearance of partiality. They err in their argument that the state's interest justifies section 6(b)'s ban on political parties' speech.

For obvious reasons, the Court is sympathetic to defendants' desire to protect judges from · political pressures. Nonetheless, section 6(b) is no more constitutional as applied to judicial campaigns than it is as applied to other campaigns for nonpartisan office. California can, of course, prohibit judges from engaging in partisan political activity once they are in office. *See Letter Carriers*, 413 U.S. at 564–65, 93 S.Ct. at 2889–90. But California cannot suppress speech by political parties concerning the merits of judicial candidates' qualifications for office. *See Buckley*, 424 U.S. at 14, 96 S.Ct. at 632.

Once again, section 6(b) takes aim at the wrong evil. "The political threat to judicial independence ... is attributable far more to the decision to elect judges in the first place, and to subject them to re-election, than it is to party endorsement." *Geary II*, 880 F.2d at 1085 (Canby, J., dissenting). The choice that California *can* make is between permitting voters to elect judges, with all the partisan political activity that such campaigns entail, and appointing the state's judiciary in order to insulate judicial officers from political pressures. As Judge Reinhardt explained:

> The State of California cannot have it both ways. If it wants to elect its judges, it cannot deprive its citizens of a full and robust election debate. It cannot forbid speech by persons or groups who wish to make their views, support, or endorsements known. Nor can it complain if the citizens wish to make their electoral judgments based in part on recommendations made by political parties. If the people are to be given the right to choose their judges directly, they are free, rightly or wrongly, to consider the political philosophy of the candidates.

*Geary III*, 911 F.2d at 294 (Reinhardt, J., concurring) (footnote omitted); *see also Geary II*, 880 F.2d at 1085 (Canby, J., dissenting).

III.

IT IS HEREBY ORDERED that:

1. Plaintiffs' motion for summary judgment is GRANTED.

2. Defendants' motion for summary judgment is DENIED.

3. Article II, section 6(b) of the Constitution of the State of California is hereby declared violative of the First and Fourteenth Amendments to the Constitution of the United States.

4. Defendants, their officers, agents, servants, employees, attorneys, and all persons acting under, in concert with, or for them, are, and each is, permanently enjoined from enforcing Article II, section 6(b) of the Constitution of the State of California.